**Lonnie HALL, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A04–0606–CR–287.**

Court of Appeals of Indiana.

July 18, 2007.

Elizabeth A. Gabig, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Lonnie Hall ("Hall") was convicted in Marion Superior Court of two counts of murder, two counts of robbery, two counts of criminal confinement, two counts of burglary, and one count of theft. Hall appeals, raising the following issues for our review, which we consolidate and restate as:

I. Whether the juvenile court abused its discretion when it waived jurisdiction to the adult criminal court;

II. Whether the trial court erroneously denied Hall's motion to suppress his statement to the police;

III. Whether the trial court erroneously denied Hall's request to sever Counts Ten and Eleven;

IV. Whether there is sufficient evidence to support the alleged burglary that occurred on January 29, 2004; and,

V. Whether Hall's sentence is inappropriate in light of the nature of

the offense and character of the offender.

We affirm.

### Facts and Procedural History

The facts most favorable to the convictions demonstrate that Hall broke into a duplex at 152 South Villa on January 12, 2004, and stole a DVD player, a camera, and $500. The owner of the home was Yairam Aguiar Gonzales ("Yairam"). Manuel and Mayra Gonzales ("Manuel" and "Mayra") had also been living at the duplex with their son, Yairam, since they moved to the United States from Cuba the summer of 2003. Hall told Linden Cornewell ("Cornewell"), his cousin's boyfriend, about his exploits, and they decided to return to steal more valuable items.

They returned to the duplex on January 29, 2004, and knocked on the door. Manuel and Mayra were at home and answered the door. Hall pulled out a gun and told them to get on the floor. The couple complied, and Cornewell pulled out a roll of duct tape and some rope that they had brought along to tie them up. Hall took Manuel's wallet and split the cash in it with Cornewell. Hall also picked up the downstairs phone to take with him. Hall went upstairs and placed everything of value in a bag. According to Hall, at that time Cornewell said "[T]hey seen us," and Cornwell "just started stabbing them, and stabbing them, and [Hall] was just standing there," but "really couldn't do anything." Ex. Vol., State's Ex. 127 p. 8. After they left the house, Hall said that Cornewell disassembled the knife and threw it in the grass. Hall placed the jeans and a trench coat he had been wearing at the time of the murders in his cousin's basement.

When Yairam returned to the house, he found his parents bound with rope and duct tape and lying on the floor in a pool of their blood. They were obviously dead. He looked for the phone to call the police, but the phone was missing. He then ran back to his car to use his cell phone.

On January 30, 2004, Hall and Cornewell were detained by the police pursuant to a Crime Stopper's tip. The police found a black nine-millimeter handgun in Hall's waistband. Detective Roy West ("Detective West") observed a red stain on one of Hall's boots. He also noticed that there were scratch marks and bruises on Hall's knuckles. Because Hall was a juvenile, Detective West followed the usual procedure of collecting any items with which Hall could harm himself while in custody. As Hall was wearing two layers of clothing, Detective West collected Hall's boots, his belt, and his outer layer of clothing. Hall was left in the interrogation room wearing a red plaid shirt, blue sweat pants and socks. Detective Jesse Beavers ("Detective Beavers") obtained a search warrant for the articles of clothing that had been collected from Hall.

Hall's mother and stepfather, Shelli and Tim Hall, were brought to the Homicide Office where Hall was being detained. Detective Beavers read Hall and his parents a list of Hall's rights. Detective Beavers then left Hall and his parents alone for twenty-five minutes to discuss whether Hall wanted to give a statement. After consulting, Hall and his mother signed a waiver of rights form. Hall then gave a recorded statement to Detective Beavers, while his parents remained in the room. In his statement, Hall admitted to the burglaries on January 12th and 29th. Hall admitted to stealing some liquor from the Gonzalez residence and storing it in his cousin's freezer. Hall also told Detective Beavers that he had left his jeans and trench coat that he had been wearing at his cousin's house.

After he gave the statement, Hall and his stepfather went with the police to help them find the knife that Cornewell had discarded after the murders. The police also searched the residence of Amy Ball, Hall's cousin. They confiscated a book bag, two knives, duct tape, ropes, and electrical tape. Hall helped the police locate the phone and the wallet that he had taken from the Gonzaleses' residence. The police also confiscated the items of clothing that Hall said he was wearing on the night of the murders. Subsequent laboratory testing of these items revealed that Manuel and Mayra's blood was on both Hall's pair of jeans and his trench coat.

On May 30, 2004, the State filed two motions requesting the juvenile court to waive its jurisdiction over Hall. After two hearings, the juvenile court granted both motions. On June 22, 2004, the State charged Hall with two counts of felony murder, two counts of murder, two counts of robbery, two counts of criminal confinement, three counts of burglary, and two counts of theft. Upon Hall's motion, two counts regarding the burglary of his uncle's home on January 28th were severed from the remaining eleven charges.

The trial court conducted a jury trial on the first eleven charges on March 13–15, 2006, and Hall was found guilty as charged on all eleven counts. Hall also pleaded guilty to Class B felony burglary, based upon the burglary of his uncle's home on January 28th. In return, the State agreed to dismiss the Class D felony theft charge. Hall was sentenced to ten years for this burglary, to run concurrent to the sentences imposed on the other eleven counts. A sentencing hearing was conducted on April 28, 2006, and the trial court merged the counts for murder and for felony murder, thereby vacating the two felony murder counts. The trial court also reduced the robbery convictions to Class C felonies.

The trial court sentenced him to fifty-five years on each murder count, to be served consecutively. The trial court also sentenced him to ten years on the Count Nine burglary conviction to be served consecutively. All other sentences were ordered to run concurrently to these three, for an aggregate term of 120 years. Hall now appeals. Additional facts will be provided as necessary.

## I. Waiver of Juvenile Jurisdiction

Hall first contends that because he was an immature fifteen-year-old with attention deficit hyperactivity disorder, he should have been tried in the juvenile court. When reviewing a claim of the sufficiency of a waiver order, we will not weigh the evidence or judge the credibility of the witnesses. *K.M. v. State*, 804 N.E.2d 305, 308 (Ind.Ct.App.2004), *trans. denied* (citation omitted). We look only to the evidence most favorable to the State and the reasonable inferences to be drawn therefrom, considering both the waiver hearing and the findings of fact given by the court. *Id.* Unlike criminal proceedings, juvenile proceedings are of a general civil nature, and the burden upon the State is to establish by a preponderance of the evidence that juvenile jurisdiction should be waived. *Id.* The juvenile court is entitled to give the evidence before it whatever weight it deems appropriate. *Id.* A juvenile court's decision to waive its jurisdiction is reviewed for an abuse of discretion. *Id.*

On May 30, 2004, the State filed two motions requesting that the juvenile court waive its jurisdiction over Hall. The first petition alleged that pursuant to Indiana Code section 31–30–3–4 juvenile jurisdiction should be waived because Hall was charged with an act that would be murder if committed by an adult and there was probable cause to believe that he had committed the crime. Appellant's App. p. 55.

This petition pertained to four charges of murder and two charges of robbery. The second petition alleged that pursuant to Indiana Code section 31–30–3–2 jurisdiction should be waived because the act committed was heinous and part of a repetitive pattern of delinquent acts. Appellant's App. p. 373. This petition was in regards to two counts of criminal confinement, three counts of burglary, and two counts of theft. After a hearing on each motion, the juvenile court granted both petitions to waive jurisdiction.

The relevant statute regarding the first motion is Indiana Code section 31–30–3–4 (2004), which provides that:

Upon motion of the prosecuting attorney and after full investigation and hearing, the juvenile court shall waive jurisdiction if it finds that:

(1) the child is charged with an act that would be murder if committed by an adult;

(2) there is probable cause to believe that the child has committed the act; and

(3) the child was at least ten (10) years of age when the act charged was allegedly committed;

unless it would be in the best interests of the child and of the safety and welfare of the community for the child to remain within the juvenile justice system.

The juvenile court issued specific findings on each of these three points.

In its second order, regarding three charges of burglary, two charges of criminal confinement, and two charges of theft, the juvenile court again issued specific findings of fact regarding the statutory elements. The relevant statute for this order is Indiana Code section 31–30–3–2 (1998), which reads as follows:

Upon motion of the prosecuting attorney and after full investigation and hearing, the juvenile court may waive jurisdiction if it finds that:

(1) the child is charged with an act:

(A) that is heinous or aggravated, with greater weight given to acts against the person than to acts against property; or

(B) that is a part of a repetitive pattern of delinquent acts, even though less serious;

(2) the child was at least fourteen (14) years of age when the act charged was allegedly committed;

(3) there is probable cause to believe that the child committed the act;

(4) the child is beyond rehabilitation under the juvenile justice system; and

(5) it is in the best interests of the safety and welfare of the community that the child stand trial as an adult.

Again, the juvenile court's findings address each element under this statute. The order recounts the facts regarding the January 12, 2004 burglary as well as the January 29th burglary that ended in the heinous confinement and murder of Manuel and Mayra. The trial court found it particularly relevant that Hall had forced Manuel and Mayra to the floor with a gun and then "hog tied" them with their arms behind their backs and their mouths duct-taped shut. The juvenile court also pointed out that Manuel and Mayra were stabbed repeatedly in the face and neck area, causing their deaths.

In the instant case, the record and both of these orders reflect careful statutory compliance by the juvenile court. Specifically, the juvenile court held a hearing on both motions to investigate Hall's conduct. After hearing testimony, the juvenile court found that probable cause existed that Hall committed an act that would be murder in addition to other heinous acts. The juvenile court also found that Hall had a prior history of true findings in juvenile court,

which if committed by an adult would have consisted of Class D felony escape, Class D felony criminal recklessness, and Class A misdemeanor criminal conversion. In light of the heinous offenses and his past adjudications, the juvenile court found that Hall was beyond rehabilitation of the juvenile justice system. Finally, the court determined that it was in the best interest of the community's safety and welfare that Hall's case be waived to adult court.

In support of his contention that both waivers were inappropriate, Hall draws our attention to evidence from expert witnesses at the waiver hearing that Hall had attention deficit hyperactivity disorder, which he alleges could be better treated with new medications. Expert testimony also indicated that, given the appropriate treatment, there was a moderate probability that Hall would conform his conduct to society's rules and laws. Hall maintains that this expert testimony demonstrates that "treating and rehabilitating [Hall] within the juvenile system would serve the interests of safeguarding the community and its welfare by guiding [Hall's] development into a productive and law-abiding contributor to the community." Br. of Appellant at 13. In other words, he contends that the orders are inappropriate under both of the statutes because it would be in his and society's best interests for Hall to remain in the juvenile system.

Initially, we note that the juvenile court is under no obligation to accept the recommendations of expert witnesses. *Thomas v. State*, 562 N.E.2d 43, 46 (Ind. Ct.App.1990) (the trial court has the duty to independently determine the appropriateness of waiver). "[T]he determination of whether a juvenile is beyond rehabilitation is fact sensitive and can vary widely from individual to individual and circumstance to circumstance." *K.M.*, 804 N.E.2d at 309. Here, the State presented evidence that Hall had numerous previous encounters with the juvenile justice system, which had failed to curb his unlawful and violent behavior. In fact, the probation department recommended that the juvenile court waive jurisdiction "for the safety of the community, as well as the heinous and seriousness of the crime." Tr. p. 954.

Additionally, Dr. Shelby Keglar ("Dr.Keglar"), who testified on Hall's behalf, stated that Hall only had a "moderate" probability for successful treatment, and that he had concerns about whether Hall could be successfully treated. *Id.* at 846. He also described Hall's behavior as "impulsive" with a tendency for seeking thrills. *Id.* at 821. Dr. Paul Aleksic ("Dr.Aleksic") admitted that he had been unaware of the charges against Hall when he had evaluated him. *Id.* at 863. Dr. Aleksic agreed that Hall was "severely delinquent" and that it was "very possible" that his conclusion about Hall's probability of treatment could be wrong. *Id.* Dr. Roger Jarjoura also testified that the Department of Correction adult treatment program was just as good as the juvenile system's treatment program. *Id.* at 1010.

The violent and unprovoked circumstances of these vicious crimes as well as Hall's juvenile record provide ample support for the trial court's determination that Hall is beyond rehabilitation in the juvenile justice system and that waiver of jurisdiction was in the best interests of the safety and welfare of the community. Hall's claim amounts to a request to reweigh the evidence, which we will not do. Because it is the province of the juvenile court to weigh the effects of waiving or retaining jurisdiction and because the juvenile court's decision is supported by facts in the record, we find no abuse of discretion.

## II. Admission of Statement

Hall next contends that the trial court erroneously denied his motion to suppress the statement he gave to the police. The requirements for the waiver of constitutional rights of a child have been codified by our legislature at Indiana Code section 31–32–5–1 (1998), which provides:

Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:

(1) by counsel retained or appointed to represent the child if the child knowingly and voluntarily joins with the waiver;

(2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:

(A) that person knowingly and voluntarily waives the right;

(B) that person has no interest adverse to the child;

(C) meaningful consultation has occurred between that person and the child; and

(D) the child knowingly and voluntarily joins with the waiver; or

(3) by the child, without the presence of a custodial parent, guardian, or guardian ad litem, if:

(A) the child knowingly and voluntarily consents to the waiver; and

(B) the child has been emancipated under IC 31–34–20–6 or IC 31–37–19–27, by virtue of having married, or in accordance with the laws of another state or jurisdiction.

The State bears the burden of showing that a juvenile defendant received all of the protections under this statute. *Brown v. State*, 751 N.E.2d 664, 670 (Ind. 2001). However, as with any review of the admissibility of a confession, we review the evidence in the light most favorable to the trial court's decision. *Id.* We review a trial court's ruling as to the voluntariness of a waiver by looking at the totality of the circumstances, considering only the evidence favorable to the State and any uncontested evidence. *Carter v. State*, 686 N.E.2d 1254, 1257 (Ind.1997).

Indiana Code § 31–32–5–4 provides that a review of the totality of the circumstances in juvenile cases is to include consideration of the child's physical, mental, and emotional maturity; whether the child or parent understood the consequences of the child's statements; whether the child and parent had been informed of the delinquent act; the length of time the child was held in custody before consulting with his parent; whether there was any coercion, force, or inducement; and whether the child and parent were advised of the child's right to remain silent and to the appointment of counsel.

*Cherrone v. State*, 726 N.E.2d 251, 253–54 (Ind.2000).

In the case at hand, Hall's mother and stepfather, Shelli and Tim Hall, were brought to the Homicide Office where Hall was being detained. After several hours of waiting, Hall's parents were told that Hall was a suspect in a double murder. Detective Beavers then brought Hall's parents into the room with Hall and read them a list of Hall's rights. Hall's mother and Hall signed the top portion of the document, acknowledging the advisement of rights. Detective Beavers dated this portion, signifying that it had been signed at 9:25 p.m. Detective Beavers told Hall and his parents that he would give them time to talk alone and decide whether Hall wanted to give a statement to the police. Detective Beavers then left the room.

About twenty-five minutes later, Detective Beavers returned to the interview room, and Hall and his mother said that

Hall was willing to give a statement. Detective Beavers read them the second portion of the waiver of rights form, which states, "I have read the above and understand it fully. I, with the consent of my parents, expressly waive the above rights and will answer any questions asked of me by the officer." Ex. Vol., State's Ex. 125. Both Hall and his mother again signed this form. Detective Beavers read Hall's mother the last part of the waiver of rights form, which stated, "I have read the above and understand it fully. I with the consent of my son expressly waive his rights to remain silent and right to counsel before any questions are asked." Tr. p. 303. Ex. Vol., State's Ex. 125. Hall's mother signed this form for the third time.

Hall then gave a recorded statement to Detective Beavers, while Hall's parents remained in the room. As the recording of the interview began, Detective Beavers reviewed Hall's waiver of rights with him to ensure that Hall understood what rights he was giving up. He asked Hall and his mother if they had signed the waiver form, and they acknowledged they had.

### A. *Meaningful Consultation*

■ Hall first contends that he was not afforded a meaningful consultation with his mother and stepfather before signing the waiver. The "meaningful consultation" requirement will be met when the State demonstrates "actual consultation of a meaningful nature or the express opportunity for such consultation, which is then forsaken in the presence of the proper authority by the juvenile, so long as the juvenile knowingly and voluntarily waives his constitutional rights." *J.D.P. v. State*, 857 N.E.2d 1000, 1009 (Ind.Ct.App.2006), *trans. denied*, (citation omitted).

The record reveals that on January 31 st, Detective Beavers told Hall, his mother, and his stepfather, that Cornewell had implicated Hall in the double murder. Detective Beavers read Hall and his parents the list of Hall's rights, which they signed at 9:25 p.m. Detective Beavers advised the Hall family that he would leave them alone to consult and that the purpose of the meeting was to decide if they wanted to talk to the detectives. Br. of Appellant at 58. Detective Beavers then left them alone in the room to consult for approximately twenty-five minutes; however, he did not leave the waiver of rights form in the room with them. Upon the detective's return, neither Hall nor his parents requested more time to consult. Instead, Hall and his parents said that Hall was willing to make a statement, and Hall and his mother signed the second part of the waiver form.

Our Supreme Court has already held that the fact "[t]hat the waiver of rights form was not left in front of [the defendant and his parents] does not lead to the conclusion that they were unable to consult meaningfully with each other. What is important is that the child and adult be aware of and understand the child's rights in order to discuss them intelligently." *Patton v. State*, 588 N.E.2d 494, 496 (Ind. 1992). Here, there is no indication that Hall and his mother were not aware of his rights. The detectives reviewed Hall's rights with him and his parents before allowing them to consult for approximately twenty-five minutes to decide whether Hall should make a statement. Such evidence demonstrates that there was sufficient opportunity for meaningful consultation before Hall and his mother waived his rights.

### B. *Voluntariness of Waiver*

■ Hall next contends that the totality of the circumstances indicate that his written waiver was not voluntary. The record reveals that Hall was fifteen and a half years old when he made his statement

to the police, and that he had a lengthy juvenile record with adjudications for escape, theft, criminal recklessness and criminal conversion, demonstrating he had interacted with the justice system on prior occasions. Hall and his parents were read the rights several times. Hall's parents remained with him while he gave his statement to the police. Neither Hall nor his mother at any time during the interview process invoked any rights, indicated that they wanted the questioning to stop, or requested an attorney. In fact, after making the statement, Hall and his stepfather went with the police to help them recover evidence from the crime.

The totality of the circumstances demonstrate that Hall and his parents were informed of the charges against him and of his rights to remain silent and have counsel appointed, and that they understood the consequences of Hall's statements to the police. Hall has not presented any evidence of force, threats or inducement used to persuade his mother and him to waive his rights. Hall clearly consulted with his parents for approximately twenty-five minutes, and we are not convinced that the voluntariness of Hall's waiver is negated by the fact that he was alone, handcuffed, and not wearing any shoes in the interrogation room for five hours prior to the consultation. *See Harden v. State*, 576 N.E.2d 590, 592–93 (Ind.1991) (holding that meaningful consultation requirement was met where father was provided twenty minutes of private consultation with his son after his son had been held in interrogation room for four hours). Nor does Hall allege that his immaturity or attention deficit hyperactivity disorder prevented him from understanding his rights. The trial court was well within its discretion to conclude that the waiver was signed voluntarily and that his statement should be admitted into evidence.

### C. *Right to Counsel under Article I, § 13*

Hall next contends that his statement to police was in violation of Article I, Section 13 of the Indiana State Constitution. This article states, in part, that "[I]n all criminal prosecutions, the accused shall have the right to a public trial, by an impartial jury, in the county in which the offense shall have been committed; to be heard by himself and counsel." Hall contends that because he had requested an attorney at a December 2003 hearing regarding his violation of a suspended commitment, a form of juvenile probation, his right to counsel under this article was violated when he was questioned on January 31, 2004, without the presence of his attorney.

It is true that Section 13 affords citizens greater protection than its federal counterpart, the Sixth Amendment right to counsel. *Malinski v. State*, 794 N.E.2d 1071, 1078–79 (Ind.2003). The rights afforded under Section 13 also attach prior to the filing of formal charges against the defendant. *Id.* "The Sixth Amendment of the United States Constitution and Article I § 13 of the Indiana Constitution guarantee the right to counsel at any critical stage of prosecution where counsel's absence 'might derogate from the accused's right to a fair trial.'" *Koehler v. State*, 499 N.E.2d 196, 198 (Ind.1986) (quoting *U.S. v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)). This right may be waived if it is done so knowingly, intelligently, and voluntarily. *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562, (1975); *Hagy v. State*, 639 N.E.2d 693, 694 (Ind.Ct.App. 1994).

The general rule is that the Sixth Amendment right to counsel is "offense specific" and cannot be invoked once for all

future prosecutions. *J.D.P.*, 857 N.E.2d at 1006–07 (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). Hall attempts to circumvent this federal rule by claiming that Article I, Section 13 of the Indiana Constitution provides him the right to have counsel present when he previously requested counsel for a separate offense. We can find no Indiana case law that supports this proposition.

Hall was assigned counsel in December 2003 to represent him for an alleged violation of his suspended commitment. On January 30, 2004, the detectives told Hall and his parents that they were questioning him in regards to a double homicide. These are two separate offenses. The detective read Hall and his parents the Miranda rights, and Hall and his mother signed a waiver, agreeing to be questioned without having an attorney present. The police have an interest in investigating new or additional crimes after an individual is formally charged with one crime. *State v. Ashley*, 661 N.E.2d 1208, 1213 (Ind.Ct. App.1995) (quotation omitted). "To find that the defendant invoked his . . . right to counsel on the present charges merely by requesting the appointment of counsel at his arraignment on the unrelated charge is to disregard the ordinary meaning of that request." *McNeil*, 501 U.S. at 178, 111 S.Ct. 2204. Therefore, we find no error in denying Hall's motion to suppress his statement.

### III. Severance of Counts

On February 22, 2005, Hall filed a motion to sever Counts Ten through Thirteen from the remaining charges. Counts One through Nine were based upon events that occurred on January 29, 2004. Counts Ten and Eleven were in regard to the burglary and theft of the Gonzaleses' house on January 12, 2004. Counts Twelve and Thirteen charged a burglary and theft that occurred on January 28, 2004, at 50 N. Tacoma, the residence of Hall's uncle. The trial court severed Counts Twelve and Thirteen but denied Hall's request to sever Counts Ten and Eleven. Hall claims that denial of his request for severance on these counts was in error.

Offenses may be joined in a trial when the offenses "(1) are of the same or similar character, even if not part of a single scheme or plan; or (2) based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." Ind.Code § 35–34–1–9(a) (1998). Hall argues that he was entitled to severance as a matter of right, and, in the alternative, that even if no right to sever existed the trial court abused its discretion in refusing a severance. Indiana Code section 35–34–1–11(a) provides defendants with the right to severance where "two (2) or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character." As the statute explicitly states, severance is required as a matter of right under this provision only if the sole ground for joining is that the offenses are of the same or similar character. *Ben–Yisrayl v. State*, 690 N.E.2d 1141, 1145 (Ind.1997).

■ Although Hall argues that the offenses were joined because they were of the same character, he told police that when he had broken into the Gonzales household the first time, he had learned that there were still valuable items left in the house. Ex. Vol., State's Ex. 127. Hall showed the house to Cornewell, who had never been there before, and told him that he knew that there were valuable items in the house from his previous burglary of the same house. *Id.* Based upon this information, Cornewell and Hall devised a plan where Hall would watch the occupants of the house while Cornewell tied

them up, and then they would search the house together. In light of these statements, it is clear that the offenses were based on "a series of acts ... constituting parts of a single scheme or plan." *See* Ind.Code § 35–34–1–9(a). Accordingly, Hall had no right to severance under Indiana Code § 35–34–1–11(a).

If severance is not a matter of right, Indiana Code § 35–34–1–11(a) further provides that:

> the court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:
>
> (1) the number of offenses charged;
>
> (2) the complexity of the evidence to be offered; and
>
> (3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

 A trial court's refusal to sever charges that may be joined under this provision is reviewed for an abuse of discretion. *Ben–Yisrayl,* 690 N.E.2d at 1146; *Baird v. State,* 604 N.E.2d 1170, 1184 (Ind. 1992). Hall argues that even if the counts were based on a series of acts constituting part of a single scheme or plan, the trial court abused its discretion because the number of charges and jury instructions as well as the complexity of the evidence would confuse "[e]ven the most exacting juror." Br. of Appellant at 40. We disagree.

This case consisted of eleven charges, and the evidence consisted of Hall's own statements, testimony by the investigating detectives, photographs, and evidence of the weapons used and the blood found on Hall's clothing. None of this evidence can

be considered "complex." *See Kahlenbeck v. State,* 719 N.E.2d 1213, 1216 (Ind.1999) (holding that evidence consisting of the testimony of surviving victims, ballistics evidence and defendant's statement was not considered "complex"). Because these charges involved incidents on separate dates, distinguishing the evidence on these counts and applying the law would be very straightforward. Therefore, we find no abuse of discretion.

## IV. Sufficiency of the Evidence

 Hall next contends that the State presented insufficient evidence that Hall committed burglary on January 29, 2004. In reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor assess the credibility of the witnesses. *Love v. State,* 761 N.E.2d 806, 810 (Ind. 2002). We must respect the jury's exclusive province to weigh conflicting evidence. *McHenry v. State,* 820 N.E.2d 124, 126 (Ind.2005). On review, we look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom. *Id.* We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

Indiana Code section 35–43–2–1 (2004) provides that a person armed with a deadly weapon who breaks and enters the building or structure of another person, with intent to commit a felony in it, commits burglary, a Class B felony. Hall contends that the State failed to prove the element of breaking and entering because Hall stated that Manuel and Mayra had "kind of wave[d] them] in" after he and Cornewell had knocked on the door. Ex. Vol., State's Ex. 127. We find this argument without merit.

 Hall admitted to Officer Beavers that he held a gun on Manuel and Mayra as they opened the door, and he made them get on the floor. *Id.* "Using

even the slightest force to gain unauthorized entry satisfies the breaking element of the crime." *Davis v. State*, 770 N.E.2d 319, 322 (Ind.2002). "For example, opening an unlocked door or pushing a door that is slightly ajar constitutes a breaking." *Id.* (citation omitted). Likewise, when access is accomplished by threatening the victim with force to allow entry, a breaking has occurred. *Dew v. State*, 439 N.E.2d 624, 625 (Ind.1982). Certainly, Hall's statement that he held a gun on the couple as they opened the door supports the inference that he used force to break in to the duplex. Consequently, the evidence was sufficient to support Hall's burglary conviction.[1]

## V. Inappropriate Sentence

Lastly, Hall contends that his aggregate sentence of 120 years is inappropriate in light of the nature of the offense and character of the offender. We bear in mind that sentencing determinations, including whether to vary from the presumptive sentence, are within the sound discretion of the trial court. *Ruiz v. State*, 818 N.E.2d 927, 928 (Ind.2004). If a trial court relies upon aggravating or mitigating circumstances, it must do the following: (1) identify all significant aggravating or mitigating circumstances; (2) explain why each circumstance is aggravating or mitigating; and (3) articulate the evaluation and balancing of the circumstances. *Id.*

### A. *Aggravating Circumstance*

■ Hall first contends that the trial court abused its discretion in assigning aggravating weight to the heinous nature of the crime. In discussing what sentence to impose for each conviction, the trial court found that the aggravating and mitigating circumstances balanced and imposed the presumptive term for each count. However, in deciding whether to run the sentences consecutively or concurrently, the trial court stated the following:

> And with respect to consecutive and concurrent sentences, the Court is going to find that because of the violent and vicious nature of the offense, and the Court believes the evidence shows that Lonnie Hall understood the consequences of his actions. Lonnie Hall had previously burglarized the Gonzales home. He ... knew that they had items in there that he wanted. He knew that they would be home. He carried a bag with—with the ropes and the duct tape into the home, with the intent to tie them up in the course of the robbery. Once inside the home, the Gonzales were violated, horrendously, in the security of their home. Their bodies were gagged, tied, tortured, and they were murdered. So, the Court finds that the violent and heinous nature of these actions justifies a consecutive sentence on Count Two and Count Four ... Count Nine will be served consecutively.

Tr. pp. 633–638. The trial court ordered the remaining counts to be served concurrently.

Hall maintains that consecutive sentences are inappropriate, as the trial court had previously found that the aggravating and mitigating factors were in equipoise. We recently addressed the same issue in *Gleaves v. State*, 859 N.E.2d 766, 771 (Ind. Ct.App.2007). In that case, as in the case at hand, the trial court found the aggravating and mitigating circumstances in equipoise in ordering the presumptive sentence

---

1. Hall also maintains that he was entitled to judgment on the evidence, dismissing this same burglary charge. Because we conclude there was sufficient evidence to support Hall's burglary conviction, we likewise conclude that Hall was not entitled to judgment on the evidence on the burglary charge.

on each count. The trial court then turned its attention to the issue of whether the sentences should run concurrently or consecutively. The trial court concluded that the sentences should be run consecutively because of the additional aggravating circumstance that there were two victims. We interpreted the trial court's

> comments to constitute the finding of an additional aggravating circumstance, i.e., multiple victims, over and above the ones already identified by the trial court in its previous comments. As the aggravators and mitigators were found to be in equipoise without it, it is an exercise in simple logic to conclude that the aggravating circumstances preponderate with the addition of this factor.

*Id.* Here, the trial court found the additional aggravating factor of the nature and circumstances of the crime, which tipped the balance in favor of ordering three of Hall's convictions to run consecutively.

■■■ Hall next contends that the trial court abused its discretion because the nature and circumstances of these crimes are comprised of material elements of burglary, criminal confinement and murder, all of which he was convicted. Hall is correct that a trial court may not use a material element of the offense as an aggravating circumstance. *See Lemos v. State,* 746 N.E.2d 972, 975 (Ind.2001). "However, the trial court may find the nature and circumstances of the offense to be an aggravating circumstance." *Id.* So long as the trial court takes into consideration facts not needed to prove the elements of the offense, the nature and the circumstances of the crime can appropriately be considered as aggravating circumstances. *McCann v. State,* 749 N.E.2d 1116, 1120 (Ind.2001).

In *Shane v. State,* 769 N.E.2d 1195, 1199 (Ind.Ct.App.2002), the aggravating circumstances found by the trial court at sentencing for a burglary conviction were that the offense was well planned, that defendant had entered an occupied dwelling, that the proceeds were used to purchase drugs and handguns, and that the victims had been traumatized. We held that these factors described the nature and circumstances of the burglary, not the material elements, and therefore could be used to support the defendant's sentence enhancement. *Id.*

In the case at hand, the trial court likewise attempted to describe the atrocious nature and circumstances of Hall's crimes. As in *Shane,* the trial court found that Hall had planned out the attack beforehand, bringing rope and duct tape to tie up the Gonzaleses. The trial court further noted that "[t]heir bodies were gagged, tied, [and] tortured." Br. of Appellant at 5. The Indiana Code provides that a trial court may assign aggravating weight to the harm, injury, loss, or damage suffered by the victim of an offense if such harm was significant and greater than the elements necessary to prove the commission of the offense. Ind.Code § 35–38–1–7.1(a)(1) (2004 & Supp.2005). The autopsy reports describe in detail the multiple injuries caused by blunt force trauma as well as stab wounds inflicted upon the Gonzaleses' faces and necks, while they were gagged with duct tape and had their extremities bound by rope. Upon review of the record, we are likewise convinced that the Gonzaleses were horrendously tortured before they died. It is manifestly clear that Hall's commission of these crimes was significantly more heinous than the typical convictions for murder, burglary, and criminal confinement, and therefore, the trial court did not abuse its discretion in considering the nature and circumstances of these crimes.

### B. Inappropriateness of Sentence

■■■ Hall next contends that his 120–year sentence is inappropriate in light of

the nature of the offense and character of the offender. Indiana's appellate courts have the constitutional authority to revise a sentence if, after consideration of the trial court's decision, the court concludes the sentence is inappropriate in light of the nature of the offense and character of the offender. Ind. Appellate Rule 7(B) (2006); *Marshall v. State,* 832 N.E.2d 615, 624 (Ind.Ct.App.2005), *trans. denied.*

Here, we find that Hall's sentence is not inappropriate. Regarding the nature of the offense, this was a particularly heinous offense as detailed above. Most importantly, Hall's crimes victimized three individuals: Manuel, Mayra, and Yairam. Our Supreme Court has indicated that multiple victims is an aggravating circumstance that supports the imposition of consecutive sentences, noting that doing so "seems necessary to vindicate the fact that these were separate harms and separate acts against more than one person." *Serino v. State,* 798 N.E.2d 852, 857 (Ind.2003). *See also Estes v. State,* 827 N.E.2d 27, 29 (Ind.2005) (Defendant "committed the offenses against two victims, so at least one consecutive sentence is appropriate.").

Regarding Hall's character, it is significant that he had a lengthy history of juvenile adjudications and multiple opportunities to curb his unlawful and violent behavior. As the trial court noted, he made bomb threats at school, he fought with other students, and he refused to take his medications. He was on the juvenile equivalent of probation when he ran away, cut his ankle bracelet, stole a gun, and then planned to commit the present offenses. We conclude that the nature of the offenses and the character of the offender warrant an aggregate sentence of 120 years.

### Conclusion

The juvenile court did not abuse its discretion in waiving jurisdiction over Hall to adult court. The trial court did not abuse its discretion in admitting Hall's statement to the police or in denying Hall's request to sever Counts Ten and Eleven. Sufficient evidence supports Hall's conviction for burglary, and Hall's 120–year sentence is not inappropriate in light of the nature of the offense and character of the offender.

Affirmed.

DARDEN, J., and KIRSCH, J., concur.